**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

KIMBERLY SELLERS,                )
14001 St. Germain Drive, #C641   )
Centerville, Virginia 20121        )
                                 )
     Plaintiff,              )
                                 )
v.                           )    Case No. _____
                                 )
ELAINE DUKE,                 )
ACTING SECRETARY, DEPARTMENT OF  )
HOMELAND SECURITY,       )
245 Murray Lane, SW        )
Washington, DC 20528-0075     )
                                 )
     Defendant.           )
_____ )

## COMPLAINT AND DEMAND FOR JURY TRIAL

Kimberly Sellers, by and through her undersigned counsel, hereby files this Complaint against Elaine Duke, as the Acting Secretary of the Department of Homeland Security, for discrimination, retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").

## PARTIES AND JURISDICTION

1.     Kimberly Sellers is an individual resident of the Commonwealth of Virginia.  Ms. Sellers is and at all times relevant to this Complaint was employed by Immigration and Customs Enforcement ("ICE"), a component of the Department of Homeland Security ("DHS"), headquartered at 500 12th Street, S.W., Washington, D.C. 20536.

2.     Defendant Elaine Duke is the Secretary and head of DHS.  ICE, as a component of DHS, is an agency as that term is defined in 5 U.S.C. § 552(a)(1) for the purposes of 42 U.S.C. § 2000e-16(a).  Secretary Duke is sued in her capacity as the Secretary and head of DHS.

3.      Jurisdiction is proper in this Court pursuant to 42 U.S.C. § 2000e-16(c) and 28

U.S.C. § 1331 relating to "any civil action or proceeding arising under any Act of Congress

regulating commerce."

4.      Venue is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C.

§ 1391(b), as Secretary Duke is the head of a governmental agency of the United States that does

business in and is headquartered in the District of Columbia, Ms. Sellers' official duty station is

at ICE's headquarters in the District of Columbia, many decisions made and events giving rise to

this action occurred in the District of Columbia, and key documents, including employment

records, and witnesses are located in the District of Columbia.

5.       Ms. Sellers filed her Formal Complaint of Discrimination with the Office of

Diversity and Civil Rights of ICE on February 25, 2015 after initiating contact on October 23,

2014 alleging discrimination and retaliation.  Ms. Sellers initiated contact with that department

within 45 days after having a reasonable suspicion that the adverse conduct described herein was

motivated by discrimination on the basis of Ms. Sellers's gender and status as a

mother/caregiver.  DHS issued a Final Agency Decision on July 27, 2017.  Ms. Sellers files this

Complaint within 90 days of that Final Agency Decision and, accordingly, Ms. Sellers exhausted

her administrative remedies and may pursue her claims in this Court pursuant to 42 U.S.C. §

2000e-16(c).

**FACTS**

6.      Ms. Sellers is a career government employee who has worked for ICE and its

predecessor, the U.S. Customs Service, for nearly 30 years.  Currently, Ms. Sellers works for

Homeland Security Investigations ("HSI"), a component of ICE.

7.      Ms. Sellers has always been a highly regarded, highly capable employee for ICE. Due to her outstanding skill and stellar performance, she has worked on projects with increasing responsibility and high level visibility and has received numerous merit-based promotions, assignments, and details.

8.      Ms. Sellers began her federal career with the U.S. Customs Service in 1989 while completing her Master's Degree that included a concentration on Organizational Communications encompassing characteristics indicative of successful organizations as well as security matters, such as terrorism.  During this time, she served in a part time GS-4 Clerk position.

9.      After finishing her Master's program in 1990, Ms. Sellers joined the U.S. Customs Service full-time as a Customs Inspector, a position which she held for the next five years.

10.      In 1993, the United States initiated the National Performance Review, later called the National Partnership for Reinventing Government, an interagency task force to reform the federal government.  The U.S. Customs Service was reorganized as part of this initiative, eventually becoming ICE in 2003.

11.      In 1995, Ms. Sellers was recruited to be a member of the reorganization team and served as lead instructor for the project.  She was also reassigned to the agency's headquarters in Washington, D.C. in 1996.   During this period, she was a direct report to the Assistant Commissioner and also was selected to participate in Executive level meetings that determined the direction of the organization and were attended by top leadership of the U.S. Customs Service.  As a result of these efforts, she received awards from multiple Assistant Commissioners as well as from the Commissioner of Customs.

12.     In or around 1997, Ms. Sellers was recruited to become a Special Agent and received a recommendation from the Assistant Director to the Assistant Commissioner of Investigations.  Upon becoming a Special Agent, Ms. Sellers was reassigned to the Office of the Special Agent in Charge in Atlanta, Georgia, where she remained for approximately five years. She became a Special Agent in lieu of other very promising opportunities largely due to international opportunities that existed with the Office of Investigations.

13.     In the Summer of 2003, Ms. Sellers received her first international assignment when she was selected to serve as an Acting Attaché in New Delhi, India.  She performed exceptionally well in this position.  She performed so well, in fact, that she received a Letter of Commendation which stated:

> all tasks were handled in an efficient, competent professional and exemplary manner as evidenced by numerous positive comments made by the Deputy Chief of Mission, State Department Officials, Law Enforcement counterparts at the Embassy and the local community in India.  It is obvious that Ms. Sellers has the tact, diplomacy, intelligence, job knowledge and disposition/attitude to effectively work in a foreign environment.  The purpose of this letter is to commend her for the exceptional job performed as the Acting Customs Attaché in India, and to highly recommend her for a future overseas assignment.

14.     Following this posting, Ms. Sellers transferred to ICE's headquarters to serve as a Special Agent/Desk Officer.

15.     Beginning in September 2008, Ms. Sellers was assigned by HSI to the Department of State (hereinafter, "DOS") as a Liaison to the Bureau of International Narcotics and Law Enforcement Affairs (hereinafter, "INL").  In an introductory email, Ms. Sellers's predecessor stated the following about her:

> I've worked with Kim for years and she's not only a dear friend, but an extremely brilliant, knowledgeable, competent and well rounded investigator.  Before becoming a Special Agent, Kim was

an U.S. Customs Inspector.    From the inception of the DHS/CBP/ICE Container Security Initiative (CSI), Kim has been instrumental in the implementation and development of the program.    Kim has traveled the world negotiating with foreign countries in establishing the CSI port offices as well as inspecting existing facilities.    Kim is extremely knowledgeable on all Port Security related issues…You'll enjoy working with Kim, she's a phenomenal individual with a dynamic personality.

16.      During her time as the Liaison, only approximately five to ten of the approximately 50 Liaisons with HSI were female.

17.      Although she remained an HSI employee, as a Liaison Ms. Sellers reported directly to the DOS and was responsible for a variety of significant responsibilities, including acting as an advisor/liaison to the border security team, preparing, coordinating, and attending conferences and presentations around the globe, acting as a subject matter expert for INL, interfacing with embassies and consulates, and interacting with U.S. and international officials at high-level meetings and conferences.  Ms. Sellers was also recognized as an expert on a variety of topics.  She also represented the agency in a number of forums, both domestically and internationally.  Ms. Sellers also made presentations worldwide as an expert on behalf of ICE, HIS, INL, and the U.S. Government and assisted in preparing and coordinating meetings and international conferences.  In addition to these responsibilities, which made up the bulk of her duties with HSI, Ms. Sellers also spent time developing interagency agreements and performing other duties related to coordinating sessions for the International Law Enforcement Academy ("ILEA").

18.      As Liaison, Ms. Sellers enjoyed full access to the DOS, including possession of a State Department Identification Card and access to the DOS computer and email system, including access to the classified and cable system.  She was, for all intents and purposes, treated

as a DOS employee and had full access to DOS offices, including overseas, without escort, medical offices, and developmental opportunities.

19.     During her time as Liaison, Ms. Sellers engaged in a number of high-level events. A few examples include:

a.   Presented at events where other presenters included the Assistant Secretary of State, U.S. Attorney, ICE Assistant Directors, and the Secretary General of INTERPOL.

b.   Participated as an official, accredited delegation member at a number of events including:

i.   The Organization of American States (OAS)

ii.   CICTE meetings held in Washington, D.C.

iii.   Asia Pacific Economic Cooperation (APEC) in Washington, D.C., Phuket, Thailand, and Moscow, Russian Federation; in fact, at the invitation of the Government of Thailand, she served as a presenter at the, "APEC Capacity Building Workshop on Combatting Corruption and Illicit Trade through Tracking Cross Border Financial Flows, International Asset Recovery and Anti Money Laundering Efforts."

c.   On several occasions, served as an official delegation member of the U.S.- China Joint Liaison Group on Law Enforcement Matters at meetings held in Washington, D.C. and Beijing, China.  She delivered a presentation in Beijing to JLG members and led a delegation that included the Director General and now upper anti-graft minister.

    d.   Lead a panel and facilitated a discussion group at a Maritime workshop in Cape Verde, and was a presenter at a workshop in Fiji.

    e.   Was often an ILEA instructor and instructed on several occasions at Bangkok, Budapest, and Gaborone.

    f.   Regularly met with the Assistant Secretary, Generals, high-level officials form within the U.S. and other governments, and heads of International and Non-Governmental Organizations.

20.    Throughout her tenure as a Liaison, Ms. Sellers was a valuable asset to both HSI and INL, as recognized by her consistently positive feedback and reviews and exceptional performance on several high-level tasks.  She met and exceeded all of HSI's legitimate expectations for her employment.

21.    Ms. Sellers was always highly commended by peers, superiors, and others within the field.  Some of the high praise she received included:

    a.   The Deputy Assistant Director, International noted: "S/A Sellers secured a seat at the table with other key federal agencies and funding", with the response from the Executive Associate director, "This is good"

    b.   The United Nations Office on Drugs and Crime ("UNODC") acknowledged Ms. Sellers's contributions by stating: "Thank you for sending us Kim; thank you very much for Ms. Sellers' participation."  UNODC very much appreciated Ms. Sellers's active participation that clearly contributed to the success of the first Experts Group Meeting.

    c.   In a letter to Director Morton, Assistant Secretary David Johnson stated: "I also want to convey our special gratitude for the work that Kim Sellers, ICE Senior

Special Agent has been doing in the INL Crime Office.  Due in part to her

leadership and professionalism, we have been able to strengthen our partnership

with ICE on promoting international law enforcement cooperation and overseas

training."

    d.    The INL Chief of Staff stated: "…I thought you meant you were leaving INL, was

        going to protest."

22.    In June 2013, Ms. Sellers received an award from the Assistant Director of

International Affairs and a separate award from the Assistant Director Office of Professional

Responsibility for the anti-corruption project.  In November 2013, she received a Director's

Award for the same project.  Also in June 2013, ICE received a Certificate of Appreciation from

DOS INL largely in part due to Ms. Sellers' efforts.

23.    While still serving as Liaison, Ms. Sellers began leave under the Family and

Medical Leave Act ("FMLA") on August 2, 2013.  At that time, Ms. Sellers was in the final

stages of completing the adoption of her daughter and was traveling to and from China to bring

her daughter home.

24.    Despite her leave status, Ms. Sellers was continuously emailed and called by

colleagues and superiors while on leave and asked to perform significant amounts of work.

Among other things, Ms. Sellers was asked to arrange for instructors, make travel plans, prepare

briefings and agendas, and engage in other coordination efforts for ILEA activities in El

Salvador, Peru, Bangkok, and Budapest, and was asked and expected to complete budget and

funding submissions for ILEA.

25.    In the majority of instances in which she was asked to complete tasks, Ms. Sellers

reminded her colleagues and superiors that she was still on FMLA leave and caring for her

daughter.  Nevertheless, she was still expected to complete the assigned tasks, and did so when other could not during her absence.

26.     Ms. Sellers' FMLA leave was discontinued on October 1, 2013.  As she had always planned to do, Ms. Sellers was prepared to return to her Liaison position full-time at the conclusion of her FMLA leave.

27.     However, on October 15, 2013, Ms. Sellers was told that she was going to be removed as Liaison and was being reassigned back to HSI headquarters.  At the same time, Ms. Sellers was informed that Mr. Charles Allen would assume her Liaison duties.

28.     Before Ms. Sellers adopted her daughter and went out on FMLA leave, there was never any discussion of discontinuing her in the Liaison position.  In fact, before Ms. Sellers adopted her daughter, there were extended discussions regarding significant projects that she would be involved in in the short- and long-term as Liaison.

29.     Ms. Sellers was surprised to learn about the removal of her duties as Liaison, as she understood that to be in violation of the FMLA's requirement than an employee must be returned to the same or similar position at the end of her leave period.

30.     There was no legitimate basis to remove Ms. Sellers from the Liaison position or replace her with Mr. Allen.  Mr. Allen was less qualified for the position than Ms. Sellers and had a litany of disciplinary issues with HSI.  In fact, he had only recently joined the INL team after he was purportedly removed from his post in Brazil due to a physical altercation involving his female subordinate.

31.     Ms. Sellers later discovered that Mr. Allen's signature appeared on official documents as early as September 13, 2013 while she was still on FMLA leave and that he traveled to Bangkok and China in support of an INL project Ms. Sellers had been working on

prior to her leave.  Ms. Sellers also learned that in October 2013 Mr. Allen began to direct

several projects that she had started.  Mr. Allen was involved in drafting a new policy regarding

the INL program while she was out on FMLA leave and followed through on it no fewer than six

times.

32.     Ms. Sellers was officially instructed to report to HSI headquarters on December

13, 2013.  Following the reassignment, Ms. Sellers was stripped of her Liaison duties and

consigned to performing administrative tasks in support of the INL team and Mr. Allen.  With

the demotion, she suffered a dramatic decrease in workload and duties and was no longer given

substantive tasks as when she served as Liaison.  Ms. Sellers also lost the front-facing, high-

profile, career-boosting responsibilities she previously held.

33.     After Ms. Sellers had her duties stripped from her and summarily given to Mr.

Allen, Mr. Allen exhibited a superiority complex toward Ms. Sellers and treated her in an

increasingly hostile and aggressive manner, which continues to this day.

34.     For example, in February 2014, she was informed that Mr. Allen was reassigned

to her office and was directed to remove her possessions.  While she was doing so, Mr. Allen

stood by watching her pack up her belongings while taunting her and telling her how well he was

doing in her job.   Furthermore, Mr. Allen sent an email to Katerina Kane, Mr. Allen's and Ms.

Sellers's superior, gloating about the fact that he was taking her office.  He even took

photographs showing her personal possession in boxes in preparation for her departure from the

office.

35.     Mr. Allen's hostile and aggressive acts included Mr. Allen repeatedly looming

over Ms. Seller's physically, standing uncomfortably close to Ms. Sellers or otherwise physically

intimidating her, intentionally and unnecessarily passing within arm's reach of Ms. Sellers on

numerous occasions and leering at her while doing so, standing in Ms. Sellers' way or blocking

her path, glaring and leering at her, and other physical acts designed to intimidate and prey upon

Ms. Sellers.  This physical conduct was especially troublesome to Ms. Sellers given the size

disparity between her and Mr. Allen.  Mr. Allen is approximately 6' tall and 180 pounds, while

Ms. Sellers is 5'4" and 115 pounds.  Mr. Allen engaged in this conduct even more frequently

after Ms. Sellers complained to Mr. Lopez about feeling physically threatened by Mr. Allen.

36.     Mr. Allen's conduct was especially disturbing to Ms. Sellers because she had

heard about a history of anger management issues and prior abusive conduct, particularly

towards women, which, as set forth above, led to his demotion from his post in Brazil.

37.     Mr. Allen's hostile and aggressive acts also included verbal harassment.  Mr.

Allen frequently and openly, yet unfairly, criticized Ms. Sellers, both to her personally and to

others in the office and unfairly disparaged Ms. Sellers personally and professionally.  He also

frequently attempted to take credit for Ms. Sellers's work while attempting to shift blame for his

own underperformance to her.

38.     For example, in early September 2014 during an organizational meeting with Mr.

Lopez and Mr. Allen, among others, an issue arose regarding Mr. Allen's failure to schedule an

instructor for the ILEA program.  At the conclusion of the meeting, Mr. Lopez and Mr. Allen

attempted to bully Ms. Sellers into creating a memorandum documenting the situation which

would have suggested she had a role in the scheduling problem.  At the end of the meeting, Mr.

Lopez, Mr. Allen, and a third male forced Ms. Sellers to stay after the meeting, shut the door to

the conference room, sat across the table from her, and ganged up on her to demand that she

author a document that would imply she was responsible for the error.  Ms. Sellers declined to

author the document because she was not involved in the situation and was not apprised of the underlying facts.

39.     On multiple occasions Ms. Sellers reported Mr. Allen's hostility and aggression to her supervisor, Mr. Ted Lopez, and asked Mr. Lopez to intervene.  However, Mr. Lopez ignored the situation and allowed Mr. Allen to continue his hostile treatment of Ms. Sellers.

40.     In fact, instead of remedying the situation, Mr. Lopez placed the blame for Mr. Allen's hostile and aggressive conduct on Ms. Sellers herself.  Mr. Lopez repeatedly indicated that Ms. Sellers was a troublemaker and the instigator, that she needed to "drop it" when it came to her very legitimate concerns regarding Mr. Allen, and that it was her fault, not Mr. Allen's, that she did not get along with Mr. Allen.

41.     On one occasion when Ms. Sellers sought out Mr. Lopez's assistance with Mr. Allen's aggressive behavior in April 2015, Mr. Lopez refused to intervene and again insisted that Ms. Sellers "drop it."  Ms. Sellers, concerned for her safety, asked if it would take Mr. Allen actually physically assaulting her for action to be taken in response to her concerns.  Mr. Lopez shockingly responded "that's correct."  This made Ms. Sellers very afraid in light of Mr. Allen's reported history of violence.

42.     Mr. Lopez also insisted that Ms. Sellers continue to interface directly with Mr. Allen in person at various meetings, although such meetings were not necessary to the performance of her duties.  The requirement that she meet with Mr. Allen or unnecessarily attend meetings or functions at which he would be present was another bully and intimidation tactic.

43.     After being removed from the Liaison position, Ms. Sellers was also increasingly marginalized in the organization, left out of key meetings, and was assigned strictly administrative tasks rather than substantive assignments.  Even for meetings Ms. Sellers was

permitted to attend, Ms. Sellers' suggestions were ignored and met with passive-aggressive dismissal.

44.     Ms. Sellers was also forced to do administrative and secretarial tasks for Mr. Allen.  These duties were far below her grade-level and experience and were an attempt by Mr. Allen and Mr. Lopez to put her in her place as a subservient subordinate to Mr. Allen.

45.     In June 2014, Mr. Lopez informed Ms. Sellers that she was to have no contact with INL whatsoever.  Mr. Lopez did not provide any reason for the no-contact order.  This abrupt change of duties was significantly damaging to Ms. Sellers's reputation in the office.  The assumption among Ms. Sellers's colleagues was that she made a serious mistake necessitating her sudden removal from the team.

46.     Having had her substantive duties removed and her career and reputation tarnished, Ms. Sellers sought out alternative positions to attempt to restore herself back to the position she once held.

47.     To that end, in August 2014, Ms. Sellers applied for a GS-14 Liaison to Europol position and a GS-14 Assistant Attaché to Pretoria position.   Ms. Sellers achieved outstanding scores of 99 and 90, respectively, on the assessments for these positions.  Ms. Sellers was the most qualified candidate for both of these positions.  However, the agency selected less-qualified, male employees instead.

48.     In November 2014, Ms. Sellers also applied for a detail to the National Security Council.  This was another high-level detail and would have been a significant boost to Ms. Sellers's career following her removal from the Liaison position.  Despite being well-qualified, she was not selected.

49.     On September 10, 2014, the pattern of discrimination worsened when Mr. Lopez notified the team and senior management that Ms. Sellers would transfer her last remaining responsibilities with respect to INL and ILEA to Mr. Allen and Mr. Chris Nissen, a Program Manager at HSI's headquarters, and be removed from both programs entirely.

50.     Mr. Nissen, like Mr. Allen, has a history of disciplinary issues resulting and had been removed from international assignments.

51.     As a result of this new directive from Mr. Lopez, Ms. Sellers had no substantive responsibilities or assignments and was reduced to a position equivalent to that of a clerk or assistant.  She was assigned only to managing ICE's travel calendar, which involves nothing more than inputting foreign travel into an excel spreadsheet, and supporting others in her division.

52.     The combination of these actions, culminating in the removal of all of Ms. Sellers's remaining substantive duties and responsibilities, humiliated her and destroyed her professional reputation and rendered meaningless the decades Ms. Sellers had devoted to furthering her career.  Ms. Sellers was left in a veritable black hole where she was blocked from any future career progression or even lateral transfers due to her complete lack of substantive responsibility.

53.     Ms. Sellers often reported her concerns regarding the increased marginalization and lack of responsibilities and duties to Mr. Lopez, to no avail.  Mr. Lopez refused to restore Ms. Sellers' substantive assignments or return her to a position of authority or significance in HSI.  Despite Ms. Sellers' many pleas to Mr. Lopez, no changes were made to provide her with any meaningful duties and responsibilities.

54.     As a result, Ms. Sellers initiated contact with ICE's EEO office on October 23, 2014 alleging gender- and caregiver-based discrimination.

55.     Originally when the agency began removing her duties immediately after her FMLA leave, Ms. Sellers contacted the agency's EEO office and was told her issues, including removal from her Liaison position, was a potential violation of FMLA and handled by the leave office, not the EEO Office.  Accordingly, Ms. Sellers filed a complaint with the Office of Special Counsel for violation of her FMLA rights.

56.     However, as set forth above, over the next year she had more duties gradually removed and given to men, culminating in her remaining duties being given to Mr. Allen and Mr. Nissen in September 2014.  She then realized that it was her gender and caregiver status, rather than her FMLA leave, that motivated the agency's conduct.

57.     Ms. Sellers's suspicion that the agency's conduct was motivated by her gender and status as a mother, instead of her FMLA leave, was confirmed less than a month later in November 2014.  During a meeting in which Ms. Sellers was yet again asking for Mr. Lopez's assistance and asking that her substantive duties be restored or replaced, Mr. Lopez responded by explicitly referring to the fact that Ms. Sellers was caring for her young daughter as a purported justification for her marginalization.  He specifically stated that he had his "wife stay at home and take care of all of that," referring to child care and indicating that he believed a mother's place was at home, not the work-place.  Mr. Lopez suggested that that Ms. Sellers was unwilling or incapable of performing her duties strictly based on her status as a caregiver, which was simply not true, and implied that he was doing Ms. Sellers a favor by replacing her as the Liaison and removing her substantive responsibilities because no mother could handle those job duties while raising a child.  Even after the adoption of her daughter, Ms. Sellers continued to provide

exceptional performance and remained more than capable of handling all responsibilities and duties assigned to her.

58.     After filing her EEO complaint, the pattern of antagonism and hostility got worse. Mr. Allen became more physically aggressive and hostile towards Ms. Sellers and Mr. Lopez allowed his misconduct to continue unabated while blaming Ms. Sellers.  Ms. Sellers also remained completely marginalized in the office, which destroyed her reputation, career, and career progression opportunities.

59.     On November 4, 2014, Mr. Lopez called Ms. Sellers to a meeting and informed her that Mr. Allen reported that she was "spreading rumors" about him.  Mr. Lopez then told Ms. Sellers that Mr. Allen had threatened her, stating that if she did not stop spreading the "rumors," Mr. Allen would take formal action against her.  Mr. Lopez stated that Mr. Allen intended to file an action against Ms. Sellers for slander and creating a hostile work environment.  Mr. Allen's threats and intended actions were completely meritless and yet another intimidation tactic on his part.

60.     Rather than defending Ms. Sellers against Mr. Allen's false accusations, Mr. Lopez instead stated again that Ms. Sellers had brought Mr. Allen's abuse on herself.  He threatened Ms. Sellers that she better "get along" with Mr. Allen and stop creating "dissention in the group," although she was clearly not responsible for Mr. Allen's misconduct.

61.     After Ms. Sellers initiated the EEO process, in an act of retaliation and continuing discrimination, the agency took more career-blocking actions that further destroyed Ms. Sellers's career and ability to advance in the agency, including even to the position of responsibility she held before being demoted after adopting her daughter.

62.     For example, in May 2015, Ms. Sellers applied for a GS-14 Assistant Attaché to London position.  Ms. Sellers achieved an outstanding score of 96 on the assessment and was the most qualified candidate for the position.  Once again, however, she was passed over for a less qualified male.  Ms. Sellers was not even interviewed for the position.

63.     In 2015, Ms. Sellers also applied for a detail as a Liaison to U.S. Customs and Border Protection.  This would have been a promotion to a GS-15 level.  Given Ms. Sellers' past experience as a CBP officer and her work with the higher echelons of Customs and Border Protection, she was a prime candidate for the post.  However, Raul Aguilar, a male with less experience and who was less qualified, was selected instead.

64.     In addition, during the summer of 2016, Ms. Sellers was approached by a high-ranking official for the Office of National Drug Control Policy (hereinafter, "ONDCP"), a division of the White House, regarding taking a position as a Liaison to that agency.  After submitting her résumé, and meeting with the director, ONDCP asked Ms. Sellers to onboard as a Liaison.  ONDCP sent no less than five requests to HSI for Ms. Sellers's appointment as a Liaison.  Despite being well-qualified and specifically requested by ONDCP, Ms. Sellers was not allowed to serve as Liaison.  Instead, a male, Jeremiah Healy, was given that Liaison position, although he was less qualified for the position than Ms. Sellers.

65.     In December 2016, Ms. Sellers also applied for a detail to the White House Situation Room.  This was an on-site detail assignment which would involve high-level responsibilities and outstanding interfacing and networking opportunities.  The position could also include, on occasion, telephone calls with the President.  Ms. Sellers' experience with crisis communications in the past made her particularly well-qualified for the position.  However, she was not selected.

17

66.     In May and June 2017, Ms. Sellers applied for several other details to the National Security Council, including Director for Critical Infrastructure, Director for Cybersecurity, Director for Health and Development, and Director for Security Screening and Vetting.  These were on-site, high-profile details which would have been a tremendous boost to Ms. Sellers's résumé and restored many substantive responsibilities she had lost.  Again, she was not selected for any of the positions despite being very qualified for each.

67.     Ms. Sellers also applied for a position with DHS's one year Master's Program through the National Defense University in 2015.  This program offered a tremendous networking opportunity and chance for Ms. Sellers to learn from top professionals.  It also offered an opportunity for Ms. Sellers to position herself for promotions or even lateral moves to positions with the same level of responsibility and prestige as before her duties were stripped from her.  Despite being well-qualified for the program, she was not selected.  Instead, a male was chosen.

68.     Ms. Sellers also applied for selection to the Leadership in Homeland Security program in 2016 and 2017.  This was a development program open to several agencies, including ICE, which would have offered Ms. Sellers important career training and opportunities to interface and network with high-level officials in several Homeland Security agencies and components.  It would have also been an important addition to Ms. Sellers' résumé and a stepping-stone to a higher level position.  Ms. Sellers was not selected either year.

## COUNT I
## Discrimination in Violation of Title VII

69.     Ms. Sellers re-alleges and incorporates by reference Paragraphs 1 through 68 as if set forth fully herein.

70.     ICE, with the intent of discriminating against Ms. Sellers on the basis of her gender and status as a mother/caregiver, engaged in a pattern of discriminatory behavior as described herein, and, based on and as a result of that discrimination, (1) removed Ms. Sellers' substantive responsibilities and duties, (2) denied her promotion to a GS-14 position as Liaison to Europol, (3) denied her promotion to a GS-14 position as Assistant Attaché to Pretoria, (4) denied her assignment to various details to the National Security Council; (5) denied her promotion to a GS-14 position as Assistant Attaché to London, (6) denied her assignment as Liaison to Customs and Border Protection; (7) denied her assignment as Liaison to ONDCP; and (8) denied her assignment to a detail at the White House Situation Room.

71.     Ms. Sellers's gender and caregiver status were the motivating factors for the foregoing conduct.

72.     The foregoing conduct violated Title VII, 42 U.S.C. § 2000e *et seq*., and therefore entitles Ms. Sellers to relief.

73.     As a direct and proximate result of ICE's discriminatory conduct, Ms. Sellers has suffered and continues to suffer injury and damage in the form of past and future loss of income and benefits of employment, lost career and business opportunities and advancements, damage to reputation, humiliation, embarrassment, fear of job loss, diminished self-confidence and self-worth, feelings of helplessness and hopelessness, fear and concern for her future ability to earn a living, and emotional distress.

74.     Due to the conscious, wanton, and/or reckless disregard for Ms. Sellers's federally protected rights and the severity of ICE's conduct, Ms. Sellers is entitled to punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Ms. Sellers prays on her behalf that this Court grant judgment in her favor against ICE, and further:

A.      Lost back pay, interest on back pay, lost future pay, lost earnings capacity, and other lost wages in an amount not less than $300,000;

B.      Compensatory damages in an amount not less than $300,000, for pecuniary and non-pecuniary losses, physical and emotional harm, pain and suffering, and reputational harm;

C.      Punitive damages in an amount not less than $300,000;

D.      Reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 2000e-5(k); and

E.      Such other and further relief as this Court deems just and proper.

**COUNT II**
**Hostile Work Environment in Violation of Title VII**

75.      Ms. Sellers re-alleges and incorporates by reference Paragraphs 1 through 68 as if set forth fully herein.

76.      ICE, primarily through the acts of Mr. Allen, Mr. Lopez, and its other employees, with the intent of discriminating against Ms. Sellers on the basis of her gender and status as a mother/caregiver, engaged in a pattern of discriminatory behavior as described herein, including:

a. Ignoring Ms. Sellers's leave status while out of the country adopting her daughter and demanding that she perform significant amounts of work;

b. Stripping Ms. Sellers of all of her substantive duties, completely marginalizing her in the office, blocking her from communicating with the INL team, and removing her from the INL team altogether, while replacing her with less-qualified, previously disciplined males;

c. Repeatedly engaging in threatening, physically aggressive and intimidating conduct towards Ms. Sellers;

d. Repeatedly verbally harassing, disparaging, and unfairly criticizing Ms. Sellers and placing blame on her for others' work, including in front of others;

e. Refusing to intervene on Ms. Sellers's behalf when she was being harassed and bullied by her co-working, and instead blaming her as the victim;

f. Forcing Ms. Sellers to meet and do administrative tasks for Mr. Allen, who had repeatedly been physically and verbally threatening and offensive towards her;

g. Openly questioning her about her ability to perform her duties simply because she was now a mother, and directly linking the removal of her duties to her status as a mother;

h. Threatening her with legal action for spreading "rumors," when in reality she had raised legitimate concerns for her safety and for being discriminated against;

i. Denying her career-advancement opportunities, promotions, assignments, details, and other opportunities that would have restored her to her previous level within the agency, given her opportunities for career growth, and removed her from the hostile environment in which she had been placed.

77.     Ms. Sellers' gender and status as a mother/caregiver were the motivating factors for the discriminatory conduct.

78.     Ms. Sellers did not welcome this conduct and perceived the working environment to be abusive and hostile.  A reasonable person in Ms. Sellers's circumstances would consider the work environment to be abusive or hostile.

79.     ICE's conduct was sufficiently severe and/or pervasive to alter the conditions of Ms. Sellers's employment and create an abusive and/or hostile working environment in violation of Title VII.

80.     As a direct and proximate result of ICE's discriminatory conduct, Ms. Sellers has suffered and continues to suffer injury and damage in the form of past and future loss of income and benefits of employment, lost career and business opportunities and advancements, damage to reputation, humiliation, embarrassment, fear of job loss, diminished self-confidence and self-worth, feelings of helplessness and hopelessness, fear and concern for her future ability to earn a living, and emotional distress.

81.     Due to the conscious, wanton, and/or reckless disregard for Ms. Sellers's federally protected rights and the severity of ICE's conduct, Ms. Sellers is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Sellers prays on her behalf that this Court grant judgment in her favor against ICE, and further:

A.     Lost back pay, interest on back pay, lost future pay, lost earnings capacity, and other lost wages in an amount not less than $300,000;

B.     Compensatory damages in an amount not less than $300,000, for pecuniary and non-pecuniary losses, physical and emotional harm, pain and suffering, and reputational harm;

C.     Punitive damages in an amount not less than $300,000;

D.     Reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 2000e-5(k); and

E.     Such other and further relief as this Court deems just and proper.

## COUNT III
## Retaliation in Violation of Title VII

82.     Ms. Sellers re-alleges and incorporates by reference Paragraphs 1 through 68 as if set forth fully herein.

83.     Ms. Sellers openly opposed, challenged, and reported gender discrimination and a hostile work environment on several occasions, including by filing a charge of discrimination with ICE.

84.     After and as a direct and proximate result of Ms. Sellers exercising her rights under Title VII, ICE, primarily through the acts of Mr. Allen, Mr. Lopez, and its other employees, with the intent of retaliating against Ms. Sellers, engaged in a pattern of retaliatory behavior as described herein, by:

    a.  Repeatedly engaging in threatening, physically aggressive and intimidating conduct towards Ms. Sellers and repeatedly verbally harassing, disparaging, and unfairly criticizing Ms. Sellers and placing blame on her for others' work, including in front of others;

    b.  Completely marginalizing Ms. Sellers in the office;

    c.  Refusing to intervene on Ms. Sellers's behalf when she was being harassed and bullied by her co-working, and instead blaming her as the victim;

    d.  Threatening Ms. Sellers with legal action for spreading "rumors," when in reality she had raised legitimate concerns for her safety and for being discriminated against;

    e.  Denying her career-advancement opportunities, promotions, assignments, details, and other opportunities that would have restored her to her previous level within

the agency, given her opportunities for career growth, and removed her from the hostile environment in which she had been placed.

85.     As a direct and proximate result of ICE's retaliatory conduct, Ms. Sellers has suffered and continues to suffer injury and damage in the form of past and future loss of income and benefits of employment, lost career and business opportunities and advancements, damage to reputation, humiliation, embarrassment, fear of job loss, diminished self-confidence and self-worth, feelings of helplessness and hopelessness, fear and concern for her future ability to earn a living, and emotional distress.

86.     Due to the conscious, wanton, and/or reckless disregard for Ms. Sellers's federally protected rights and the severity of ICE's conduct, Ms. Sellers is entitled to punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Ms. Sellers prays on her behalf that this Court grant judgment in her favor against ICE, and further:

A.     Lost back pay, interest on back pay, lost future pay, lost earnings capacity, and other lost wages in an amount not less than $300,000;

B.     Compensatory damages in an amount not less than $300,000, for pecuniary and non-pecuniary losses, physical and emotional harm, pain and suffering, and reputational harm;

C.     Punitive damages in an amount not less than $300,000;

D.     Reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 2000e-5(k); and

E.     Such other and further relief as this Court deems just and proper.

**COUNT IV**
**Retaliatory Hostile Work Environment In Violation of Title VII**

87.     Ms. Sellers re-alleges and incorporates by reference Paragraphs 1 through 68 as if set forth fully herein.

88.     Ms. Sellers openly opposed, challenged, and reported gender discrimination and a hostile work environment on several occasions, including by filing a charge of discrimination with ICE.

89.     After and as a direct and proximate result of Ms. Sellers exercising her rights under Title VII, ICE, primarily through the acts of Mr. Allen, Mr. Lopez, and its other employees, with the intent of retaliating against Ms. Sellers, engaged in a pattern of retaliatory behavior as described herein, including:

   a.   Repeatedly engaging in threatening, physically aggressive and intimidating conduct towards Ms. Sellers and repeatedly verbally harassing, disparaging, and unfairly criticizing Ms. Sellers and placing blame on her for others' work;

   b.   Completely marginalizing Ms. Sellers in the office;

   c.   Refusing to intervene on Ms. Sellers's behalf when she was being harassed and bullied by her co-working, and instead blaming her as the victim;

   d.   Threatening Ms. Sellers with legal action for spreading "rumors," when in reality she had raised legitimate concerns for her safety and for being discriminated against;

   e.   Denying her career-advancement opportunities, promotions, assignments, details, and other opportunities that would have restored her to her previous level within the agency, given her opportunities for career growth, and removed her from the hostile environment in which she had been placed.

90.     Ms. Sellers' prior EEO activity and opposition to the agency's hostile and discriminatory mistreatment were the motivating factors for the discriminatory conduct.

91.     Ms. Sellers did not welcome this conduct and perceived the working environment to be abusive and hostile.  A reasonable person in Ms. Sellers's circumstances would consider the work environment to be abusive or hostile.

92.     ICE's conduct was sufficiently severe and/or pervasive to alter the conditions of Ms. Sellers's employment and create an abusive and/or hostile working environment in violation of Title VII.

93.     As a direct and proximate result of ICE's retaliatory conduct, Ms. Sellers has suffered and continues to suffer injury and damage in the form of past and future loss of income and benefits of employment, lost career and business opportunities and advancements, damage to reputation, humiliation, embarrassment, fear of job loss, diminished self-confidence and self-worth, feelings of helplessness and hopelessness, fear and concern for her future ability to earn a living, and emotional distress.

94.     Due to the conscious, wanton, and/or reckless disregard for Ms. Sellers's federally protected rights and the severity of ICE's conduct, Ms. Sellers is entitled to punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Ms. Sellers prays on her behalf that this Court grant judgment in her favor against ICE, and further:

A.     Lost back pay, interest on back pay, lost future pay, lost earnings capacity, and other lost wages in an amount not less than $300,000;

B.     Compensatory damages in an amount not less than $300,000, for pecuniary and non-pecuniary losses, physical and emotional harm, pain and suffering, and reputational harm;

C.      Punitive damages in an amount not less than $300,000;

D.      Reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 2000e-5(k); and

E.      Such other and further relief as this Court deems just and proper.

Respectfully Submitted,

_____/s/_____
Nicholas Hantzes, DC Bar No. 361450
Michael Hall, Fed. DC Bar No. VA016
HANTZES & ASSOCIATES
1749 Old Meadow Road, Suite 308
McLean, Virginia 22102
Tel: (703) 378-5000
Fax: (703) 448-4434
nhantzes@hantzeslaw.com
mhall@hantzeslaw.com
*Counsel for Plaintiff*

## DEMAND FOR JURY TRIAL

Ms. Sellers demands a jury trial on all issues to which she is entitled to a jury.

_____/s/_____
Nicholas Hantzes, DC Bar No. 361450
Michael Hall, Fed. DC Bar No. VA016
HANTZES & ASSOCIATES
1749 Old Meadow Road, Suite 308
McLean, Virginia 22102
Tel: (703) 378-5000
Fax: (703) 448-4434
nhantzes@hantzeslaw.com
mhall@hantzeslaw.com
*Counsel for Plaintiff*